IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                                         |   |                                 |
|-----------------------------------------|---|---------------------------------|
| MONTGOMERY COUNTY, MARYLAND             | : |                                 |
|                                         | : |                                 |
| v.                                      | : | Civil Action No. DKC 13-0066    |
|                                         | : |                                 |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, et al. | : |                           |

**MEMORANDUM OPINION**

Presently pending and ready for review in this tax dispute are two motions: (1) the motion to dismiss filed by Defendants the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Housing Finance Agency ("the Agency") (ECF No. 14); and (2) the motion for partial summary judgment as to liability filed by Plaintiff Montgomery County, Maryland (ECF No. 24). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. Because Fannie Mae's and Freddie Mac's charters exempt them from the state and local taxes at issue in this case, Montgomery County's statutory claim seeking payment of such taxes will be dismissed, and a declaratory judgment will be entered in favor of Defendants.

## I. Background

The state of Maryland imposes recordation and transfer taxes when parties transfer title to real property. *See* Md. Code. Ann., Tax-Prop. §§ 12-101 & 13-201 *et seq.* The state of Maryland also permits its counties to impose their own transfer taxes, subject to certain conditions. *See id.* § 13-401 *et seq.* Pursuant to this authority, Montgomery County imposes transfer taxes. *See* Montgomery County Code § 52-19 *et seq.* Together, the transfer and recordation taxes imposed by the state of Maryland and the transfer taxes imposed by Maryland counties (including Montgomery County) pursuant to Section 13-402.1 will be referred to herein as "the Transfer Taxes."

Fannie Mae is a private corporation chartered by Congress to "establish secondary market facilities for residential mortgages," to "provide stability in the secondary market for residential mortgages," and to "promote access to mortgage credit throughout the Nation." 12 U.S.C. § 1716. Freddie Mac is also a congressionally chartered private corporation with a similar mission: to "provide ongoing assistance to the secondary market for residential mortgages," to strengthen and support "mortgages on housing for low- and moderate-income families" by "increasing the liquidity" of the market, and to "promote access to mortgage credit throughout the Nation." *Id.* § 1451 note. Congress created the Agency to oversee Fannie Mae

and Freddie Mac and, in 2008, appointed the Agency to serve as their conservator. *See id.* § 4617.

Fannie Mae and Freddie Mac (together, "the Entities") are generally exempt from taxation by states and localities. The federal statute chartering Fannie Mae provides as follows:

> The corporation, including its franchise, capital, reserves, surplus, mortgages or other security holdings, and income, shall be exempt from all taxation now or hereafter imposed by any State, territory, possession, Commonwealth, or dependency of the United States, or by the District of Columbia, or by any county, municipality, or local taxing authority, except that any real property of the corporation shall be subject to State, territorial, county, municipal, or local taxation to the same extent as other real property is taxed.

12 U.S.C. § 1723a(c)(2). Freddie Mac's charter is much to the same effect:

> The Corporation, including its franchise, activities, capital, reserves, surplus, and income, shall be exempt from all taxation now or hereafter imposed by any territory, dependency, or possession of the United States or by any State, county, municipality, or local taxing authority, except that any real property of the Corporation shall be subject to State, territorial, county, municipal, or local taxation to the same extent according to its value as other real property is taxed.

*Id.* § 1452(e). These exemption clauses will be referred to

collectively herein as "the Charter Exemptions."[1]

On January 7, 2013, Montgomery County filed a class action complaint in this court, alleging that the Entities have participated in thousands of real estate transactions in Montgomery County and elsewhere in Maryland involving the transfer of title to real property, but have refused to pay both the Transfer Taxes and the agricultural land transfer taxes imposed by Washington County pursuant to Section 13-502 of the Maryland Code on Tax-Property ("the Washington County Agricultural Taxes"). (ECF No. 1 ¶¶ 24-26).[2] The complaint alleges that the Entities have negligently, intentionally, or fraudulently claimed exemptions to these taxes under both state and federal law. Specifically, Montgomery County argues that

---

[1] The Agency's chartering statute includes a similar exemption provision. *See* 12 U.S.C. § 4617(j)(1) (explaining that the Agency "shall be exempt from all taxation imposed by any State, county, municipality, or local taxing authority, except that any real property of the Agency shall be subject to State, territorial, county, municipal, or local taxation to the same extent according to its value as other real property is taxed . . . )*; see also id.* § 4617(j)(2) (making the exemption provisions applicable "in any case in which the Agency is acting as a conservator or a receiver").

[2] Unlike the general allowance for county transfer taxes established by Md. Code Ann., Tax-Prop. § 13-401 *et seq.*, Section 13-502 is specific to Washington County and provides, in relevant part, that "[t]he Board of County Commissioners of Washington County may . . . levy and impose a county agricultural land transfer tax on an instrument of writing for property located in the county if the instrument is subject to the State agricultural land transfer tax under Subtitle 3 of this title." Md. Code Ann., Tax-Prop. § 13-502(a)(1).

the statutory language of the Charter Exemptions does not relieve the Entities from their obligation to pay the Transfer Taxes and that, in any event, the Charter Exemptions are unconstitutional as applied. In addition to the Entities, Montgomery County names the Agency as a Defendant, alleging that, as the Entities' conservator, the Agency stands in the shoes of Fannie Mae and Freddie Mac. (*Id.* ¶ 32). Montgomery County purports to bring this action on behalf of itself and a putative class of 18 Maryland counties that impose their own transfer taxes. (*Id.* ¶¶ 11-23).

In its first count, Montgomery County seeks a judgment pursuant to 28 U.S.C. § 2201 declaring that the Entities are not exempt from payment of the Transfer Taxes or the Washington County Agricultural Taxes under state or federal law. Pursuant to 28 U.S.C. § 2202, Montgomery County seeks additional relief in the form of payment (in an unspecified amount) of previously unpaid Transfer Taxes and Washington County Agricultural Taxes, plus applicable statutory penalties and interest. Plaintiff also asserts a second count directly under the statutes creating the Transfer Taxes and the Washington County Agricultural Taxes, alleging that Montgomery County and the other putative class members have been damaged by the Entities' refusal to pay and seeking payment (again in an unspecified amount), plus interest and penalties.

On February 4, 2013, Defendants filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). (ECF No. 14). On March 1, Montgomery County moved for partial summary judgment on liability pursuant to Fed.R.Civ.P. 56(a) (ECF No. 24) and also filed an opposition to Defendants' motion (ECF No. 26). On March 26, Defendants filed a consolidated brief in opposition to Montgomery County's partial motion for summary judgment and in reply to its motion to dismiss. (ECF No. 29). Defendants then filed a "Notice of New Authority" submitting several recently decided federal district court decisions involving similar disputes (ECF No. 30), and Montgomery County filed a reply in support of its partial summary judgment motion (ECF No. 31).

## II.  Standard of Review

As noted, Defendants seek dismissal of Montgomery County's complaint for failure to state a claim pursuant to Rule 12(b)(6). In addition to opposing this motion, Montgomery County also seeks partial summary judgment as to liability on its claims pursuant to Rule 56. Although these competing motions seemingly implicate two different standards of review, they raise identical issues and turn on purely legal questions that can be resolved without resort to matters outside of the

pleadings.[3]  Accordingly, it is appropriate to resolve Montgomery County's statutory claim for payment of the Transfer Taxes pursuant to the well-established standards for a Rule 12(b)(6) motion to dismiss.  In other words, Montgomery County's statutory claim will be dismissed if it fails, as a matter of law, to state a claim upon which relief can be granted.  *See, e.g., Sager v. Housing Com'n of Anne Arundel Cnty.*, 855 F.Supp.2d 524, 544 (D.Md. 2012) ("A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that the plaintiff alleges are true, the complaint fails, as a matter of law, to state a claim upon which relief can be granted." (internal quotation marks omitted)).

By contrast, resolution of Montgomery County's claim for declaratory relief pursuant to 28 U.S.C. § 2201 is not properly decided under Rule 12(b)(6).  As is evident from the complaint and the parties' briefs, there is an actual, ongoing controversy between them as to whether the Entities are exempt from the Transfer Taxes.  The parties disagree only as to how this controversy should be resolved.  In such circumstances, a motion

---

[3]  Montgomery County does attach certain exhibits in connection with its partial motion for summary judgment. (*See* ECF Nos. 25-2 through 25-8).  Only those documents that excerpt portions of federal statutes and congressional records (*i.e.*, ECF Nos. 25-5, 25-6, & 25-7) will be considered.  *See Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (explaining that matters of public record may be considered in ruling on a Rule 12(b)(6) motion).

to dismiss for failure to state a claim is not the appropriate means of resolving a declaratory judgment claim:

> "Where a bill of complaint shows a subject matter that is within the contemplation of the relief afforded by the declaratory decree statute, and it states sufficient facts to show the existence of the subject matter and the dispute with reference thereto, upon which the court may exercise its declaratory power, it is immaterial that the ultimate ruling may be unfavorable to the plaintiff. The test of the sufficiency of the bill is not whether it shows that the plaintiff is entitled to the declaration of rights or interest in accordance with his theory, but whether he is entitled to a declaration at all; so, even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree."

*Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, No. DKC 09-0100, 2011 WL 856374, at *18 (D.Md. Mar. 9, 2011) (quoting *120 W. Fayette Street, LLLP v. Mayor & City Council of Baltimore City*, 413 Md. 309, 355-56 (2010)); *see also, e.g.*, 22A Am.Jur.2d Declaratory Judgments § 232 (2013 supp.) ("A motion to dismiss is seldom an appropriate pleading in actions for declaratory judgments, and such motions will not be allowed simply because the plaintiff may not be able to prevail.").

Accordingly, with respect to Montgomery County's claim for declaratory relief, the parties' motions will be construed as competing cross-motions for a declaration in their favor as to

Entities' obligation to pay the Transfer Taxes. *See McKinsey & Co., Inc. v. Olympia & York 245 Park Ave. Co.*, 433 N.Y.S.2d 802, 802 (N.Y.App.Div. 1980) ("In the absence of a holding that a dispute is not ripe for adjudication, a court should not dismiss the complaint in a declaratory judgment action, but should declare the parties' rights."); *Diamond v. Chase Bank*, No. 11-0907-DKC, 2011 WL 3667282, at *5 (D.Md. Aug. 19, 2011) (construing a defendant's Rule 12(b)(6) motion to dismiss plaintiff's declaratory judgment claim as a motion for a declaration in its favor).

## III. Analysis

### A. Montgomery County's Standing to Enforce the Washington County Agricultural Taxes

Before turning to the heart of the parties' dispute about the reach and validity of the Charter Exemptions, it is necessary to address Defendants' argument – raised *via* a footnote (ECF No. 14-1, at 23-24 n. 12) – that Montgomery County lacks authority to pursue an action seeking enforcement of the Washington County Agricultural Taxes.[4]  Defendants contend that

---

[4] Initially, Defendants also argued that Montgomery County lacked authority to seek payment of the transfer and recordation taxes imposed by the state of Maryland.  (ECF No. 14, at 23-24 n. 12).  In response, Montgomery County noted that Md. Code Ann., Tax-Prop. § 14-864 permits combined actions to collect state and county taxes where such taxes are owed to the same collector – a situation that exists here, given that Md. Code Ann., Tax-Prop. § 13-208 allows the transfer and recordation

the agricultural land transfer tax permitted by Md. Code Ann., Tax-Prop. § 13-502 is unique to Washington County, such that Washington County is the only entity empowered to bring suit seeking to collect taxes imposed under that section. (*Id.; see also* ECF No. 29, at 39 n. 39). Montgomery County does not directly respond to this argument other than to observe that it filed this case as a putative class action and that Washington County will be eligible to join the proposed class. (ECF No. 26, at 33-34). This response is unavailing.

Pursuant to Maryland law, the named plaintiff "for an action to collect county tax" must be either the "governing body of the county" or "the county collector with a designation of authority." Md. Code Ann., Tax-Prop. § 14-868(2). Here, however, neither the governing body of Washington County nor its collection agent has been named as a plaintiff. Although Montgomery County can properly bring suit to enforce its own transfer taxes imposed pursuant Md. Code Ann., Tax-Prop. § 13-401 *et seq.*, and can seek certification of a class of counties with similar transfer taxes, it cannot acquire standing to enforce an altogether different category of tax that is unique

taxes imposed by the state to be collected either by the state or by the Clerk of the Circuit Court of the county where the instrument is recorded. (ECF No. 26, at 33). Apparently recognizing the persuasiveness of this authority, Defendants abandoned this additional standing argument in their combined opposition/reply brief. (*See* ECF No. 29, at 39 n. 39).

to Washington County "merely by virtue of bringing a class action" and serving as the putative class representative. *Haney v. USAA Cas. Ins. Co.*, 331 F.App'x 223, 227 (4th Cir. 2009) (unpublished); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20 (1976). Accordingly, Montgomery County's complaint will be dismissed for lack of standing to the extent it seeks relief with respect to the Washington County Agricultural Taxes.

### B. The Entities' Claimed Exemptions

Montgomery County advances three arguments as to why the Entities cannot avoid liability for the Transfer Taxes by virtue of their Charter Exemptions. First, Montgomery County asserts that, if the Transfer Taxes are deemed to be excise taxes, they are not encompassed by the "all taxation" language in the Charter Exemptions because the United States Supreme Court has interpreted that phrase to apply only to direct taxes. (ECF No. 26, at 11-21; ECF No. 25, at 14-26). In the alternative, Montgomery County contends that, if the Transfer Taxes are encompassed within "all taxation" in the first instance, they are nonetheless excepted by the Charter Exemptions' carve-out referencing "real property of the [Entities]." (ECF No. 26, at 22-25; ECF No. 25, at 26-30). Finally, Montgomery County asserts that Congress lacks constitutional authority to exempt the Entities from taxation by state and local authorities. (ECF

No. 26, at 26-34; ECF No. 25, at 10-14). Because each of these arguments fails as a matter of law, Montgomery County's statutory claim for payment of the Transfer Taxes must be dismissed, and a declaration that the Entities are exempt from the Transfer Taxes must be entered.

### 1. The Meaning of "All Taxation" in the Charter Exemptions

The first issue that must be resolved is the meaning of the phrase "all taxation," as used in the Charter Exemptions, and specifically whether the phrase encompasses, in the first instance, the Transfer Taxes at issue here.[5]

"[A]ll statutory interpretation questions . . . must begin with the plain language of the statute." *Negu'sie v. Holder*, 555 U.S. 511, 542 (2009). The first step in analyzing statutory language is to "determine whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). A determination of ambiguity is guided "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341. "If the language is plain and 'the statutory scheme is coherent and consistent,'" no further inquiry is needed. *In re Coleman*, 426 F.3d 719, 725 (4th Cir.

---

[5] Whether the Transfer Taxes are subject to the Charter Exemptions' carve-out referencing "real property of the [Entities]" is addressed below in Section III.B.2.

2005) (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 240-41 (1989)). In that scenario, "'the sole function of the courts is to enforce [the statute] according to its terms.'" *Id.* (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

As Defendants argue in their motion to dismiss (ECF No. 14-1, at 7), the plain language of the Charter Exemptions unambiguously establishes that the Entities "shall be exempt" from "all" state and local taxation, save a single exception (the meaning and applicability of which is discussed below). "'All' is an inclusive adjective that does not leave room for unmentioned exceptions." *Hertel v. Bank of Am., N.A.,* --- F.Supp.2d ----, No. 1:11–cv-757, 2012 WL 4127869, at *3 (W.D.Mich. Sept. 18, 2012); *see also* Merriam-Webster Online Dictionary, 2013 (defining "all" as "the whole amount, quantity, or extent of"; "every"). Thus, as Defendants aptly summarize, "'all taxation' means just that – *all* taxation" (ECF No. 14-1, at 7), and the Transfer Taxes are encompassed, in the first instance, within the broad and unambiguous language of the Charter Exemptions.

Montgomery County nonetheless argues that the United States Supreme Court's decision in *United States v. Wells Fargo Bank*, 485 U.S. 351, 355 (1988), establishes that the phrase "all taxation" is a term of art that applies only to forms of direct

taxation and does not apply to excise taxes. Thus, Montgomery County maintains that, if the Transfer Taxes are indeed excise taxes as Defendants posit, they are not protected by the Charter Exemptions. Defendants respond that the controlling Supreme Court decision is not *Wells Fargo* but *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941), which confirms that unqualified statutory tax exemptions of entities must be read broadly according to their plain meaning. As a growing number of courts have recognized, Defendants have the better argument.

In *Wells Fargo*, the Court considered whether "Project Notes," a form of municipal bonds issued by state and local housing authorities to finance local housing projects, were exempted from federal estate tax. *Wells Fargo*, 485 U.S. at 353. The relevant statute provided that "[Project Notes], including interest thereon, . . . shall be exempt from all taxation now or hereafter imposed by the United States." *Id.* at 355 (quoting 42 U.S.C. § 1437i(b)). In deciding whether this statutory language exempts Project Notes from estate taxation, the *Wells Fargo* Court acknowledged "the settled principle that exemptions from taxation are not to be implied; they must be unambiguously provided." *Id.* The Court went on to hold as follows:

> Well before the Housing Act was passed, an
> exemption of property from all taxation had
> an understood meaning: the property was

14

exempt from *direct* taxation, but certain privileges of ownership, such as the right to transfer the property, could be taxed. Underlying this doctrine is the distinction between an excise tax, which is levied upon the use or transfer of property even though it might be measured by the property's value, and a tax levied upon the property itself. The former has historically been permitted even where the latter has been constitutionally or statutorily forbidden. The estate tax is a form of excise tax. Consistent with this understanding, on the rare occasions when Congress has exempted property from estate taxation it has generally adverted explicitly to that tax, rather than generically to "all taxation." Placed in context, then, [the statute at issue] does not stand for [the] proposition that Project Notes were intended to be exempt from estate taxes; it stands for exactly the opposite.

*Id.* at 355–56 (internal citations omitted).

To date, at least six federal district courts have addressed whether *Wells Fargo* redefined the phrase "all taxation" for purposes of the Entities' Charter Exemptions. *See Hennepin Cnty. v. Fed. Nat'l Mortg. Ass'n*, --- F.Supp.2d ----, No. 12-cv-2075, 2013 WL 1235589 (D.Minn. Mar. 27, 2013); *Vadnais v. Fed. Nat'l Mortg. Ass'n*, No. 12-cv-1598, 2013 WL 1249224 (D.Minn. Mar. 27, 2013); *Delaware Cnty. v. Fed. Hous. Fin. Agency*, 12-cv-4554, 2013 WL 1234221 (E.D.Pa. Mar. 26, 2013); *Fannie Mae v. Hamer*, No. 12-cv-50230, 2013 WL 591979 (N.D.Ill. Feb. 13, 2013); *DeKalb Cnty. v. Fed. Hous. Fin. Agency*, No. 12-cv-50227 (N.D. Ill. Feb. 14, 2013); *Nicolai v. Fed. Hous. Fin.*

*Agency*, --- F.Supp.2d ----, No. 12-cv-1335, 2013 WL 899967 (M.D.Fla. Feb. 12, 2013); *Hertel v. Bank of Am. N.A.*, --- F.Supp.2d ----, No. 11-cv-757, 2012 WL 4127869 (W.D.Mich. Sept. 18, 2012); *District of Columbia ex rel. Hager v. Fed. Nat'l Mortg. Ass'n*, 882 F.Supp.2d 107 (D.D.C. 2012); *Oakland Cnty. v. Fed. Hous. Fin. Agency*, 871 F.Supp.2d 662 (E.D.Mich. 2012).[6] Save one, each of these courts has rejected the reading of *Wells Fargo* advanced here by Montgomery County.[7] Instead, the overwhelming majority of courts have construed *Wells Fargo* (1) as establishing the meaning of "all taxation" for statutes that exempt a particular type of *property* from taxation and (2) as having no relevance to interpreting the Charter

---

[6] These six district courts have issued a total of eight opinions on the issue. Judge David S. Doty of the District of Minnesota decided both *Hennepin* and *Vadnais* on the same day and issued largely identical opinions in the two cases. *Compare Hennepin*, 2013 WL 1235589, *with Vadnais*, 2013 WL 1249224. Likewise, in *DeKalb* – a copy of which Defendants submit in support of their motion (ECF No. 29-1) – Judge Frederick J. Kapala of the Northern District of Illinois adopted his previous decision in *Hamer* by reference.

[7] Judge Victoria A. Roberts of the Eastern District of Michigan agreed with Montgomery County's interpretation of *Wells Fargo*. *See Oakland Cnty.*, 871 F.Supp.2d at 669 ("*Wells Fargo* is dispositive of Plaintiff's case" because it "dictates that [the Entities'] statutory exemptions do not cover the Transfer Taxes."). The United States Court of Appeals for the Sixth Circuit will hear oral arguments in the Agency's appeal of *Oakland County* on May 2, 2013. *See Oakland Cnty. v. Fed Hous. Fin. Agency*, Case No. 12-2135 (6th Cir. filed Sept. 5, 2012).

Exemptions, which are statutes that exempt a specific *entity* from taxation.

Illustrative is the reasoning of the *Nicolai* court:

> The operative word in the Supreme Court's reasoning [in *Wells Fargo*] is "property." An exemption of *property* from "all taxation" has an understood meaning that does not include exemption from excise taxes like [the transfer tax imposed by the state of Florida]. The reason exempted property is not also exempted from excise taxes is simply because such taxes "are not levied upon the property itself," and it is the property itself that is exempted by statute from taxation. However, as Defendants point out, *Wells Fargo* and the cases it relies on do "not redefine 'all taxation' to mean 'some taxation but not excise taxes.' Instead, [those cases] acknowledge that for an exemption to apply, [the exemption] must match the tax - exemptions of property from taxation do not preclude excise taxes, because excise taxes are not imposed on property."
>
> However, the [Charter Exemptions] do not exempt property from taxation; they exempt the [E]ntities from taxation. Accordingly, the [transfer tax] — a tax on the [E]ntities for engaging in a particular action — triggers the exemption found in the [Charter Exemptions]. [Thus,] . . . the controlling decision is not *Wells Fargo*, but [*Bismarck*].

*Nicolai*, 2013 WL 899967, at *4-5 (internal citations omitted); *see also Hager*, 882 F.Supp.2d at 112 (holding that "*Wells Fargo* did not mandate an atextual reading of 'all taxation'; it simply considered the inherent limitations of exempting property, rather than its owner, from taxation" and instead relying on

*Bismarck*); *Hertel*, 2012 WL 4127869, at *5-6 (concluding that *Wells Fargo* is not dispositive because the Charter Exemptions "exempt the entities, not just the property involved," the situation presented by *Bismarck*).[8]

In *Bismarck*, a national bank created by Congress pursuant to the Federal Farm Loan Act acquired real property in North Dakota during the course of its normal business. *Bismarck*, 314 U.S. at 98. The bank made improvements and repairs to the property that involved the purchase of lumber and other building materials. *Id.* The bank refused to pay state sales tax on such materials, invoking the following language in Section 26 of the Federal Farm Loan Act: "'every Federal land bank and every national farm loan association, including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt from Federal, State, municipal, and local taxation, except taxes upon real estate held, purchased, or

_____

[8] The Maryland Court of Appeals also recently indicated that *Wells Fargo* does not control the meaning of the phrases "all taxation" or "any taxation" in a statute that exempts an entity from paying taxes. *See Md. Econ. Dev. Corp. v. Montgomery Cnty.*, --- A.3d ----, 2013 WL 1405293, at *5 (Md. Apr. 9, 2013) (concluding that the "use of the modifier 'any' unrestricted by qualifiers" demonstrated that the state legislature did not restrict the statutory tax exemption of an entity to direct taxes and thus implicitly agreeing with the entity's argument that *Wells Fargo* does not apply where the statute exempts a specific entity, as opposed to a type of property, from taxation).

taken by said bank or association . . .'" *Id.* at 97 n. 1
(quoting 12 U.S.C. § 931 *et seq.* (repealed 1971)).

The bank sued the retailer and the North Dakota tax
commissioner, seeking a declaratory judgment that it was not
liable for the sales tax based on the exemption language of
Section 26. The Supreme Court viewed the case as presenting two
questions: (1) whether Section 26 "include[s] within its ban a
state sales tax"; and (2) whether, under the United States
Constitution, Congress can immunize federal land banks'
activities from state taxation. *Id.* at 99. With respect to the
statutory construction issue, the *Bismarck* Court held that "the
unqualified term 'taxation,' used in [Section 26] clearly
encompasses within its scope a sales tax such as the instant
one." *Id.* The Court further held that the protection afforded
by this "plain language" could not "be frittered away" by virtue
of the statute's "including" clause (*i.e.*, "including the
capital and reserve or surplus therein and the income derived
therefrom"), which serves not as an "all-embracing definition"
but instead as "an illustrative application of the general
principle" of exemption. *Id.* at 99-100. With respect to the
second issue, the *Bismarck* Court held that Congress acted within
its constitutional powers in enacting Section 26. *Id.* at 101-
04.

As the *Hager* and *Nicolai* courts observed, *Wells Fargo* did not overturn *Bismarck* because *Bismarck* addressed a distinct issue – namely, whether a statute that exempts an entity from taxation without qualification applies to taxes imposed on the entity for engaging in certain types of activities or exercising certain privileges. *Hager*, 882 F.Supp.2d at 112-13; *Nicolai*, 2013 WL 8999967, at *5. Because this case likewise involves the applicability of the Charter Exemptions to taxes imposed on the Entities for engaging in certain activities, *Bismarck* is more apposite than *Wells Fargo*, which addressed the separate issue of whether a statutory provision exempting a particular type of property from taxation can reach excise taxes imposed as a result of activities involving the property. Thus, the applicable rule is the first holding from *Bismarck*: a statutory provision that exempts an entity from taxation without qualification includes within its ban all taxes, including the Transfer Taxes.

Montgomery County insists that *Hager* and its progeny misapplied *Bismarck*, a decision that, according to Plaintiff, turned on the bank's status as a federal instrumentality rather than on statutory construction. (ECF No. 26, at 12-14). This argument misapprehends *Bismarck*. The *Bismarck* Court very clearly divided its opinion into a statutory analysis, which examined whether the plain language of Section 26 encompassed a

20

state sales tax, and a constitutional analysis, which addressed, *inter alia*, the bank's status as a federal instrumentality. Although the latter part of the opinion is arguably relevant to Montgomery County's constitutional arguments – which are addressed below in Section III.B.3. – it has no bearing on the plain meaning of "all taxation" as used in the Charter Exemptions. *See Delaware Cnty.*, 2013 WL 1234221, at *5 ("[T]he Counties' interpretation of *Bismarck* to apply only to federal instrumentalities simply is not supported by the text of that decision[.]"); *Hamer*, 2013 WL 591979, at *6 ("[The statutory analysis in] *Bismarck* does not mention the federal instrumentality status of the Federal Land Banks, instead it relies specifically, and solely, on the statutory exemption written by Congress — a statutory exemption nearly identical to the ones in this case.").

Montgomery County also continues to maintain that there is no basis in Supreme Court precedent for determining the scope of a statutory tax exemption by focusing on the object of the exemption (*i.e.*, a specific type of property versus a specific entity) as opposed to the type of taxation (*i.e.*, direct versus excise). To support this assertion, Montgomery County relies primarily on the cases cited by the *Wells Fargo* Court. (ECF No. 25, at 18-19; ECF No. 26, at 15-20). Yet, as is clear from the parenthetical descriptions included in *Wells Fargo*, each of

those cases involved the scope of a statutory or an implied constitutional tax exemption for a particular type of property rather than for a particular entity:

> The estate tax is a form of excise tax. *Greiner v. Lewellyn*, 258 U.S. 384 (1922) (*municipal bonds* subject to federal estate taxation notwithstanding an inter-governmental tax immunity barring a direct tax on the bond); *Murdock v. Ward*, 178 U.S. 139, 148 (1900) (federal tax exemption on *federal bonds* did not extend to taxation on the right to transfer the bonds at death); *Plummer v. Coler*, 178 U.S. 115 (1900) (State may calculate estate tax based on total value of property passing through the estate, including *federal obligations* exempt from direct taxation by the State). *See also* [*U.S. Trust Co. of N.Y. v. Helvering*, 307 U.S. 57, 60 (1939)] (applying the rule of *Greiner*, *Murdock*, and *Plummer* to hold that *property* subject to a general exemption from "all taxation" would not exempt it from excise taxes such as the estate tax).

*Wells Fargo*, 485 U.S. at 355 (emphases added). As a result, there simply was no need in those cases to discuss the entity-versus-property distinction that is evident upon a comparison of *Wells Fargo* and *Bismarck* and is dispositive of the meaning of "all taxation" here. *Cf. Hertel*, 2012 WL 4127869, at *7 (observing that *Murdock* and *Plummer* involve tax-exempt property rather than tax-exempt entities and therefore have no bearing on the meaning of "all taxation" in the Charter Exemptions).[9]

---

[9] Montgomery County also cites to *Pittman v. Home Owners' Loan Corp. of Washington, D.C.*, 308 U.S. 21 (1939) and *Laurens*

Montgomery County's remaining efforts to avoid the plain meaning of the phrase "all taxation" require little discussion. First, Montgomery County contends that if Congress had wanted to exempt the Entities from the Transfer Taxes, it could have done so expressly. (ECF No. 25, at 20-22). In support, Plaintiff points to Congress' decision in 1941 to amend the charter of the Reconstruction Finance Corporation ("RFC") to specify that the entity's exemption from "all taxation" "shall be deemed to include" certain types of taxes (*e.g.*, sales taxes, use taxes). Act of June 10, 1941, Pub. L. No. 108, 55 Stat. 248. This argument ignores that "including" clauses serve an illustrative purpose only and cannot function either to expand or to limit the scope of the exemption it is describing. *See, e.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)

---

*Federal Savings & Loan Association v. South Carolina Tax Commission*, 365 U.S. 517 (1961), in support of its argument that the scope of a statutory tax exemption enacted by Congress always turns on the type of tax at issue. Neither of those cases, however, discusses the distinction between direct taxes and excise taxes. Rather, both cases support a broad interpretation of provisions exempting entities from "all taxation." *See Pittman*, 308 U.S. at 32 (holding that a federal mortgage bank had no obligation pay state stamp taxes on its mortgages because its charter exempted the entity, "including its franchise, its capital, reserves and surplus, and its *loans* and income," from "all taxation" (emphasis added)); *Laurens*, 365 U.S. at 519 (holding that a federal savings and loan association had no obligation to pay state documentary stamp taxes on promissory notes it executed because its charter exempted the entity, "including its franchise, its capital, reserves, and surplus, its *advances*, and its income" from "all taxation" (emphasis added)).

(noting that use of the term "including" indicates "the illustrative and not limitative function of the examples given") (internal citations and quotation marks omitted); *Bismarck*, 314 U.S. at 100 ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.").[10]  Indeed, the *Bismarck* Court observed that, in passing the amendment to the RFC's charter relied on by Plaintiff, "Congress sought only to confirm its original understanding of the scope of the exemption." *Id.* at 100 n. 7.

---

[10] The illustrative function of the word "including" is likewise fatal to Montgomery County's attempt to distinguish between the reach of Fannie Mae's Charter Exemption and Freddie Mac's Charter Exemption.  As Plaintiff observes, Freddie Mac's Charter Exemption states that "[t]he Corporation, including its franchise, *activities*, capital, reserves, surplus, and income, shall be exempt from all taxation now or hereafter imposed by . . . any State, county, municipality, or local taxing authority." 12 U.S.C. § 1452(e) (emphasis added).  Fannie Mae's Charter Exemption, by contrast, does not specifically mention "activities" in its "including" clause:  "the corporation, including its franchise, capital, reserves, surplus, mortgages or other security holdings, and income, shall be exempt from all taxation . . ." *Id.* § 1723a(c)(2).  Montgomery County argues that, to the extent that the word "activities" in Freddie Mac's Charter Exemption is construed as the basis for exempting excise taxes notwithstanding *Wells Fargo*, the omission of the word in Fannie Mae's Charter Exemption "is dispositive as to Fannie Mae's liability for excise taxes (and the Maryland Transfer Taxes at issue)." (ECF No. 26, at 16 n. 22).  This argument thus incorrectly presumes that the term "activities" can function to expand the scope of "all taxation."  In fact, however, "all taxation" includes excise taxes in the first instance, and the inclusion of "activities" in Freddie Mac's Charter Exemption simply serves as an illustrative example.

Second, Montgomery County argues that, because Congress is presumed to know of and adopt the Supreme Court's narrow interpretation of "all taxation" in the 1988 *Wells Fargo* decision, the legislature's decision to include nearly identical "all taxation" language in the Agency's charter in 2008 indicates that "Congress did not intend to exempt the Conservator (or the entities for which it is responsible) from applicable state excise taxes." (ECF No. 25, at 23). This argument presumes that *Wells Fargo* controls the meaning of "all taxation" as used in a statute exempting an entity from taxes – a presumption that is, for the reasons explained above, erroneous.

Third, Plaintiff asserts that if the Entities were truly exempt from all taxation except for direct taxes on real property, Congress would not have needed to specify that the Agency, as conservator for the Entities, is "not liable for any amounts in the nature of penalties or fines, including those arising from the failure of any person to pay any real property, personal property, probate, or *recording tax* or any recording or filing fees when due." 12 U.S.C. § 4617(j)(4) (emphasis added). Implicit in this argument is that the reference to "any person" in Section 4617(j)(4) necessarily means either Freddie Mac or Fannie Mae. Nothing in the Agency's charter, however, limits the definition of "person" to the Entities or the Agency.

Indeed, as Defendants observe, there are factual scenarios in which Section 4617(j)(4) could insulate the Agency from facing penalties and fines resulting from the actions or omissions of a non-exempt predecessor owner (*i.e.*, a predecessor owner other than the Entities). (ECF No. 29, at 21-23); *see also Nicolai*, 2013 WL 899967, at *3 (agreeing that the Agency's exemption from "all taxation" does not render Section 4517(j)(4) mere surplusage); *Hertel*, 2012 WL 4127869, at *4 (same).

A final point that bears mentioning is that Montgomery County's proposed construction of "all taxation" would effectively eviscerate the Charter Exemptions, as "only three forms of direct taxes exist:  taxes upon real property; taxes upon personal property, and capitations, which are 'taxes paid by every person, without regard to property, profession, or any other circumstance.'" *Vadnais*, 2013 WL 1249224, at *5 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, --- U.S. ----, 132 S.Ct. 2566, 2698-99 (2012)).[11]  Because (as discussed below) the Charter Exemptions already except taxes upon real property from exemption, Montgomery County's proposed construction would leave exempted only personal property and capitations.  Such a result "would lead to near absurdity" and would leave the "sweeping

_____

[11] For its part, Montgomery County urges – without citation to any authority – that income taxes are direct taxes. (ECF No. 26, at 32 n. 38).

26

'all taxation' formulation" of the Charter Exemptions "virtually meaningless." *Hager*, 882 F.Supp.2d at 113; *see also Hamer*, 2013 WL 591979, at *6 ("It would be inappropriate to assume that Congress intended to permit the states to tax the [Entities] with a virtually unfettered panopoly of tax options where it wrote they were to be exempt from 'all taxation[.]'").

In sum, the plain meaning of "all taxation" in the Charter Exemptions relieves the Entities of their obligation to pay the Transfer Taxes in the first instance, and each of Montgomery County's attempts to redefine the phrase fails.

### 2.    The Applicability of the Carve-Out Provisions

Montgomery County alternatively argues that, if the Transfer Taxes *are* encompassed by the "all taxation" language in the first instance, they are nevertheless excepted by the Charter Exemptions' carve-out referencing "real property of the [Entities]" because they constitute taxes that are "triggered by the ownership of real property."   (ECF No. 25, at 26-31). Defendants respond that the Transfer Taxes do not tax real property but instead are triggered only upon the transfer of real property – a situation that is not encompassed by the narrow carve-out clauses.   (ECF No. 29, at 22-28).   Here again, Defendants' position is persuasive.

As before, the inquiry must begin with an analysis of the relevant statutory language.   Fannie Mae's charter exempts the

entity from "all taxation . . . *except that any real property* of the corporation shall be subject to State, territorial, county, municipal, or local taxation *to the same extent as other real property is taxed*."   12 U.S.C. § 1723a(c)(2) (emphases added). Likewise, Freddie Mac's charter exempts it from "all taxation . . . *except that any real property* of the Corporation shall be subject to State, territorial, county, municipal, or local taxation *to the same extent according to its value as other real property is taxed*."  *Id.* § 1452(e) (emphases added).

Pursuant to the plain language of these carve-out provisions, the relevant question is whether real property "is taxed" by the Transfer Taxes.  Montgomery County is correct that the ability to transfer an interest in real property and the ability to record a deed to perfect an interest in real property are two important "sticks" in the "bundle" of property rights. Mere possession of these rights, however, does not trigger the Transfer Taxes, which are imposed only when these rights are exercised.  Put differently, real property is *not* taxed by the Transfer Taxes; the transaction (and by extension, the participant in the transaction) is.  *See Vadnais*, 2013 WL 1249224, at *3 n. 8 (a Minnesota deed transfer tax is not subject to the carve-outs because the tax "only applies when land is conveyed and is not a tax levied on the 'real property' itself"); *Delaware County*, 2013 WL 1234221, at *6 (a

"straightforward, common sense interpretation" of the Charter
Exemptions and apposite case law "makes clear that the
[Pennsylvania] Transfer Tax is a tax on the transaction and *not*
on the real property itself," such that it is not excepted by
the carve-outs). The Charter Exemptions' carve-outs therefore
cannot be interpreted as excepting the Transfer Taxes, and
Montgomery County's alternative argument must also be rejected.

### 3. The Constitutionality of the Charter Exemptions As Applied to the Entities

As a third ground for its position that Defendants are
obligated to pay the Transfer Taxes, Montgomery County asserts
that any exemption claimed by the Entities is unconstitutional.
As clarified through the extensive briefing undertaken by the
parties, this argument has two components. First, Plaintiff
contends that the Entities do not have inherent constitutional
immunity from state and local taxation because they are
publically held corporations that do not qualify as federal
instrumentalities. (ECF No. 25, at 10-14; ECF No. 31, at 5-10).
Second, Plaintiff asserts that the Entities are not statutorily
immunized from taxation because Congress did not act within the
bounds of its enumerated powers in enacting the Charter
Exemptions. (ECF No. 31, at 10-15). Defendants respond that
Congress properly conferred statutory immunity upon the Entities
consistent with its enumerated powers under the Commerce Clause

and the Necessary and Proper Clause and that, in any event, the Entities are federal instrumentalities that are constitutionally immune from state and local taxation. (ECF No. 29, at 28-39). Because Defendants are correct that the Charter Exemptions represent valid exercises of Congress' power under the Commerce Clause, there is no need to address whether the Entities qualify as federal instrumentalities that also enjoy implied constitutional immunity under the Supremacy Clause.[12]

The Commerce Clause delegates to Congress the authority "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "Under the [Supreme] Court's 'modern era' of Commerce Clause jurisprudence, . . . Congress may broadly regulate three categories of activity under its Commerce Clause

_____

[12] Pursuant to Supreme Court precedent, it is unnecessary to determine whether a congressionally created entity is a federal instrumentality that qualifies for implied constitutional immunity from taxation under the Supremacy Clause where that entity is exempt pursuant to a validly enacted statute. *See First Ag. Nat'l Bank of Berkshire Cnty. v. State Tax Comm'n*, 392 U.S. 339, 341 (1968) ("Because of pertinent congressional legislation in the banking field [regarding state taxation of national banks], we find it unnecessary to reach the constitutional question of whether today national banks should be considered nontaxable as federal instrumentalities."); *cf. Hamer*, 2013 WL 591979, at *6 (given the "broad statutory exemption" provided for by the Charter Exemptions and the holding in *First Agricultural*, "there is no need to detail the attributes associated with a federal instrumentality, to analyze how those attributes correspond to the [Entities], or to correlate that analysis with the scope of the [Charter Exemptions]").

powers:  (1) 'the use of the channels of interstate commerce,'
(2) 'the instrumentalities of interstate commerce, or persons or
things in interstate commerce, even though the threat may come
only from intrastate activities,' and (3) 'those activities
having a substantial relation to interstate commerce.'" *United
States v. Gibert*, 677 F.3d 613, 622 (4th Cir. 2012) (quoting
*United States v. Morrison*, 529 U.S. 598, 609 (2000)); *see also
Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (reaffirming that the
Commerce Clause empowers Congress to regulate purely local,
intrastate activities, provided that such activities "are part
of an economic class of activities that have a substantial
effect on interstate commerce" (internal quotation marks
omitted)).  So long as a "'rational basis exist[s] for
concluding that a regulated activity sufficiently affect[s]
interstate commerce,'" a "challenge to Congress' power under the
Commerce Clause to regulate that activity must fail." *Gibert*,
677 F.3d at 622 (quoting *United States v. Lopez*, 514 U.S. 549,
557 (1995)).  Furthermore, federal statutes must be viewed
"'with a presumption of constitutionality in mind'" and should
be invalidated "'only upon a plain showing that Congress has
exceeded its constitutional bounds.'" *Id.* at 618 (quoting
*Morrison*, 529 U.S. at 607).

Application of this precedent to statutory tax exemptions
for federally chartered entities is illustrated by two cases

relied on by Defendants. *See Dep't of Revenue & Tax. of Wyo. v. Nat'l R.R. Passenger*, No. C82-0320-H, 1982 WL 1584 (D.Wyo. Dec. 15, 1982); *SEPTA v. Pa. Pub. Util. Comm'n*, 826 F.Supp. 1506 (E.D.Pa. 1993).[13] In *Wyoming*, the state's Department of Revenue and Taxation challenged the constitutionality of a statute exempting the National Railroad Passenger Corporation ("Amtrak") "from any taxes or other fees imposed by any state, political subdivision of a state, or local taxing authority." 1982 WL 1584, at *1. Among other holdings, the *Wyoming* court concluded that the statute represented a valid exercise of Congress' power to regulate interstate commerce. *Id.* at *3. The court observed that Congress enacted the tax exemption based on its apparent conclusion that "the payment of state and local taxes was diverting some of Amtrak's federal subsidies away from their intended objective of improving rail service," a form of interstate commerce. *Id.* The court then held that Congress' conclusion was sound and that the tax exemption of Amtrak constituted a "reasonable method" of eliminating such interference. *Id.* at *4 (internal quotation marks omitted). Thus, the Commerce Clause conferred Congress with the authority to enact the exemption. *Id.*

---

[13] Although these cases pre-dated the Supreme Court's decisions in *Lopez* and *Morrison*, their reasoning is still persuasive.

*SEPTA* involved a dispute between the Southeastern Pennsylvania Transportation Authority ("SEPTA") and the Pennsylvania Utility Commission ("PUC") over the payment of certain fees assessed by PUC. In 1981, Congress had ordered the "financially-troubled" Consolidated Rail Corporation to transfer its commuter rail operations to local transportation authorities, which had the choice either of operating the rail lines directly or contracting with the Amtrak Commuter Services Corporation ("Amtrak Commuter") to do so. *Id.* SEPTA chose to operate its thirteen commuter rail lines directly. Around this same time, Congress passed the statute at issue in *Wyoming*, which exempted Amtrak "from any taxes or other fees imposed by any State, political subdivision of a State, or a local taxation authority." *Id.* (quoting 45 U.S.C. § 546b). In 1988, Congress enacted legislation providing that "'any commuter authority that could have contracted with Amtrak Commuter for the provision of commuter service but which elected to operate directly its own commuter service . . . shall be exempt from the payment of any taxes or other fees'" to the same extent as Amtrak. *Id.* (quoting 45 U.S.C. § 581(c)(5)). Based on the protection afforded by Section 581(c)(5), SEPTA filed suit against PUC to challenge three orders requiring SEPTA to make payments toward the upkeep of several bridge structures in Pennsylvania passing

over commuter railway lines owned and operated by SEPTA. *Id.* at 1511.

PUC moved for summary judgment, contending (among other things) that Congress did not act within the scope of its authority under the Commerce Clause in enacting Section 581(c)(5) "because Congress lacked a rational basis for finding that an exemption of local commuter authorities from state and local taxes furthers interstate commerce." *Id.* at 1516. Based on both the express text of Section 581(c)(5) and the legislative history of Amtrak's statutory exemption, the *SEPTA* court observed that "Congress evidently believed that . . . state taxation would diminish the ability of [local commuter authorities] to provide effective rail service." *Id.* at 1517. The court concluded that Congress' belief was "undoubtedly" reasonable, given that the imposition of taxes and fees could have "a restrictive effect on [a local commuter authority's] ability to perform its interstate commercial functions effectively" by "diverting funds away from operations." *Id.* The court further observed that, although SEPTA actually did operate its services between Pennsylvania and New Jersey, "Congress' authority under the Commerce Clause extends even to a local transit system engaged in intrastate commerce activity, provided that those intrastate activities affect interstate commerce." *Id.* at 1517 n. 10. Accordingly, the court concluded

that Section 581(c)(5) represented a rational means of addressing Congress' reasonable belief that state and local assessments interfered with the provision of interstate commuter rail services and rejected PUC's Commerce Clause challenge. *Id.* at 1518.

As in *Wyoming* and *SEPTA*, there is clearly a rational basis for Congress to conclude that the regulated activity in question (*i.e.*, the payment of Transfer Taxes by the Entities) has a substantial economic effect on interstate commerce. Congress created the Entities to establish (in the case of Fannie Mae) or to strengthen (in the case of Freddie Mac) "the secondary market for residential mortgages" and to "promote access to mortgage credit throughout the Nation." *See* 12 U.S.C. § 1716; *id.* § 1451 note; *accord Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex. rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 783 (D.C.Cir. 2008) ("Fannie Mae's mission is to increase affordable housing for moderate- and low-income families. It purchases mortgages originated by other lenders and helps lenders convert their home loans into mortgage-backed securities. The goal is to provide stability and liquidity to the mortgage market. This allows mortgage lenders to provide more loans, thereby increasing the rate of homeownership in America."); *Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1406-07 (9th Cir. 1996) (discussing Freddie

Mac's similar mission).  Based on the plain text of the Charter Exemptions, Congress apparently believed that any taxation of the Entities by states and localities could interfere with their stated missions.[14]  Such a belief is eminently reasonable, as the Entities' diversion of operating funds to pay state and local taxes could constrain their ability to facilitate access to mortgage credit in any number of ways.  As just one example, requiring the Entities to pay the Transfer Taxes could reduce the funds available for the Entities to purchase mortgages from primary mortgage market institutions – which, in turn, could limit the amount of mortgage credit made available by those institutions to potential home buyers.  Relieving the Entities from any obligation to pay the Transfer Taxes *via* the Charter Exemptions represents a rational means of addressing this possibility.

Montgomery County nonetheless asserts that Congress cannot rely on the Commerce Clause to regulate the Transfer Taxes because such taxes relate to the transfer of immovable

---

[14]  It does not appear that Congress made any specific findings regarding the effect of state and local taxation on the Entities' participation in the secondary mortgage market.  This omission is not dispositive, because although "congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, . . . the absence of particularized findings does not call into question Congress' authority to legislate." *Raich*, 545 U.S. at 21.

intrastate real property and the offering of deeds for recordation – "quintessential local activit[ies] that do[] not affect interstate commerce." (ECF No. 31, at 10-11). This argument ignores that the Commerce Clause empowers Congress to "regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17. Thus, although the Transfer Taxes may be "quintessential local activities," they are also part of an "economic class of activities" – namely, state and local taxation of the Entities – that could reasonably have a substantial effect on the secondary mortgage market. Moreover, despite Montgomery County's conclusory efforts to distinguish the activities of the Entities from "the inherently interstate activities of railroads, hotels, or Free Trade Zones" (ECF No. 31, at 10), there can be no serious doubt that participation in the secondary mortgage market to increase the availability of credit "throughout the Nation" constitutes interstate commerce. Accordingly, Plaintiff's Commerce Clause challenge must be rejected.[15]

---

[15] Montgomery County also purports to challenge the constitutionality of the Charter Exemptions by invoking the Tenth Amendment, arguing that "[a] state's power to tax is its lifeblood" and that "the Tenth Amendment is not just an end in itself, but also serves as a vital check on the federal government." (ECF No. 26, at 26-27). At bottom, however, this line of argument merely reiterates Plaintiff's Commerce Clause

## IV. Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendants will be granted in part and denied in part. Plaintiff's claim seeking to enforce the Washington County Agricultural Taxes will be dismissed for lack of standing; Plaintiff's statutory claim seeking payment of the Transfer Taxes will be dismissed for failure to state a claim; and a declaration that the Entities are exempt from the Transfer Taxes will be entered. Finally, Plaintiff's partial motion for summary judgment will be denied. A separate Order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge

---

challenge. (*See* ECF No. 31, at 14-15). Indeed, the Supreme Court has held that the inquiry into "whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution" and the inquiry into whether "an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment" are "mirror images of each other." *New York v. United States*, 505 U.S. 144, 155-56 (1992). "In the end, just as a cup may be half empty or half full, it makes no difference whether one views the question . . . as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment." *Id.* at 159. Accordingly, the conclusion that the Charter Exemptions are within the scope of Congress' Commerce Clause powers is also dispositive of Montgomery County's Tenth Amendment claim.